Filed at 9:32 A M
June 10 , 20 16
DEPUTY CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### ATHENS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>ex rel. CHRISTOPHER COLEMAN,<br><br>STATE OF GEORGIA<br>ex rel. CHRISTOPHER COLEMAN,<br><br>    Plaintiff-Relator,<br><br>v.<br><br>LAKE COUNTRY PHARMACY &<br>COMPOUNDING CENTER; CHRIS<br>VAUGHAN; and CAREY VAUGHAN,<br><br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 3:16-CV-53-CDL<br>Jury Trial Demanded<br>FILED UNDER SEAL |

## COMPLAINT

Relator Christopher Coleman, on behalf of himself, the United States of America, and the State of Georgia, brings this action and would show the following:

### JURISDICTION AND VENUE

1.    This action arises under the Federal False Claims Act, as amended, 31 U.S.C. §§ 3729 *et seq.*, and the State False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168.1 *et seq.*

2.    This court has subject matter jurisdiction over this action pursuant to 31

1

U.S.C. § 3732(a), 31 U.S.C. § 3732(b), and 28 U.S.C. § 1331.

3.     This court has personal jurisdiction over Defendants and is a proper venue pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) in that Defendants do or transact business in this jurisdiction and the violations of the False Claims Acts described herein were carried out in this district.

## THE PARTIES

4.     Lake Country Pharmacy & Compounding Center ("Lake Country") is a HealthMart Pharmacy located at 1110 Commerce Dr., Suite 110, Greensboro, Georgia 30642.

5.     Lake Country was opened in or about February 2013, and is owned and operated, by brothers Chris and Carey Vaughan, who are also its head pharmacists.

6.     The Vaughans have provided compounding services since 2008. Upon information and belief, prior to opening Lake Country, the Vaughans operated under the name of Lake Oconee Compounding.

7.     Lake Country contracts with American Pharmacy Network Solutions (APNS) to process insurance claims.

8.     Relator Chris Coleman worked at Lake Country as its third and only other pharmacist from July 2014 through May 2016.

2

9.     On May 4, 2016, Relator took an online training course offered by HealthMart on pharmacy fraud and learned that Lake Country was engaging in fraudulent billing schemes.

10.    He informed the Vaughans of this fact by text message on May 5, and in his very next conversation with the Vaughans on May 7, they requested his resignation.

## FEDERALLY FUNDED HEALTH PROGRAMS

11.    Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program. The Secretary of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS").

12.    The Medicare program is comprised of four parts. Medicare Part A ("Hospital Insurance") provides basic insurance for the costs of hospitalization and post hospitalization care. 42 U.S.C. §§ 1395c-i-5. Medicare Part B ("Medical Insurance") is a federally subsidized, voluntary insurance program that covers certain non-hospital medical services and products including the treatments at issue in this complaint. 42 U.S.C. § 1395(k). Medicare Part C ("Medicare Advantage Plans") is a plan offered by private insurers that contract with

3

Medicare to provide Part A and Part B benefits. 42 U.S.C. §§ 1395w-21-w-28.

Medicare Part D ("Prescription Drug Coverage") is a plan offered by private

insurers approved by Medicare to provide basic insurance for prescription

drugs. 42 U.S.C. §§ 1395w-101-w-154.

13.    Reimbursement for Medicare Part B claims is made by the United States

through CMS. CMS, in turn, contracts with fiscal intermediaries to administer

and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. §

1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R.

§ 421.5(b). Separate payments are made for each CPT procedural code listed on

the Medicare Part B claims.

14.    Reimbursement for Medicare Part C claims is made by the United States

through CMS. CMS makes fixed monthly payments to each Medicare Choice

organization for each enrolled individual, i.e., a capitated payment. Prescription

drug coverage is included in many Medicare Advantage plans.

15.    Reimbursement for Medicare Part D claims is made by the United States

through CMS.

16.    CMS, which administers Medicare and Medicaid, selects Prescription Drug

Sponsors ("Plan Sponsors") to provide drug coverage to Part D beneficiaries. Plan

Sponsors are responsible for the administration and payment of individual

prescription drug claims, but most contract with pharmacy benefit managers ("PBM"), which enter into arrangements with the pharmacies that will actually fill prescriptions. The PBMs then further subcontract with those individual pharmacies, including Signal Mountain Pharmacy. Separate payments are made for each NDC listed on the Medicare Part D claims.

17.    Plan Sponsors and PBMs are private entities that have contracted with the government (in the case of Plan Sponsors) and subcontracted with a government contractor (in the case of PBMs).

18.    In order to receive Medicare funds, enrolled providers, including Lake Country, together with its authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the states.

19.    Among the rules and regulations which enrolled providers, including Defendants, agree to follow are to: (a) bill Medicare for only those covered services which are medically necessary; (b) not bill Medicare for any services or items which were not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information relating to provider costs or services; (c) not engage in any act or omission that constitutes or results in over-

utilization of services; (d) comply with state and federal statutes, policies and regulations applicable to the Medicare Program; and (e) not engage in any illegal activities related to the furnishing of services to recipients.

20.    Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* establishes Medicaid, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. CMS administers Medicaid on the federal level. Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered, payment levels for services and administrative and operational procedures.

21.    At all times relevant to this Complaint, the United States provided funds to the States through the Medicaid program pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* Enrolled providers of medical services to Medicaid recipients are eligible for payment for covered medical services under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act.

22.    By becoming a participating provider in Medicaid, enrolled providers agree to abide by the rules, regulations, policies and procedures governing claims for payment, and to keep and allow access to records and information as required by Medicaid. In order to receive Medicaid funds, enrolled providers,

6

together with authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the State.

23.    42 C.F.R. §§ 455 *et seq.*, expressly states that a provider must certify that he is in compliance with all federal and state statutes and regulations in order to receive payment from Medicaid.

24.    TRICARE is a government-funded program that provides medical benefits to retired members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members, as well as reservists who were ordered to active duty for thirty (30) days or longer. The program is administered by the Department of Defense and funded by the federal government.

25.    Lake Country submits or causes to be submitted claims for reimbursement to government insurance programs including Medicare Part D, Georgia Medicaid, and Tricare, hereinafter collectively referred to as "Insurance."

## FRAUDULENT SCHEMES

### False Billing for Compound Drugs

26.    Pharmacy compounding is a practice in which pharmacists combine, mix,

7

or alter ingredients to create a customized medication for an individual customer in response to a licensed practitioner's prescription.

27.     Compounded prescription drug preparations can contain: (1) all Part D drug product components; (2) some Part D drug product components; or (3) no Part D drug product components.

28.     However, only costs associated with those components that satisfy the definition of a Part D drug are allowable costs under Medicare because the compounded preparations as a whole do not satisfy the definition of a Part D drug.

29.     Medicare Benefit Policy Manual Chapter 15, § 50.4.7 and § 1862(a)(1)(A) of the Social Security Act (codified at 42 U.S.C. § 1395y(a)(1)(A)) require that drugs be "reasonable and necessary" to be covered under Medicare. *See also* 42 U.S.C. § 1320c-5(a)(1).

30.     For Insurance's prescription drug benefit for self-administered drugs, statutory provisions generally make FDA approval a precondition for coverage and payment (with certain narrow exceptions). *See* 42 U.S.C. § 1396r-8(k)(2)(A) (Medicaid Drug Rebate Program, defining "covered outpatient drug"); 42 U.S.C. § 1395w-102(e)(1) (defining covered drugs under Medicare Part D).

31.     Interpretive guidance on Medicare Part B also clarifies that, in most

8

circumstances, FDA approval is a condition for drug reimbursement under that program. *See* Medicare Benefit Policy Manual, CMS Pub. 100-2, ch. 15, § 50.4, *available at* http://go.usa.gov/cQ2xP (Dec. 22, 2015).

32.     Similarly, Medicare Benefit Policy Manual Chapter 15 § 50.4.1 instructs carriers and intermediaries to deny coverage for drugs that have not received final marketing approval by the FDA, unless instructed otherwise by CMS.

33.     The Medicare Benefit Policy Manual, Chapter 16, "General Exclusions from Coverage," § 180, instructs carriers to deny coverage of services related to the use of noncovered drugs as well.

34.     Tricare also requires that all ingredients in the compound must be lawfully marketable in the United States.

35.     Reimbursement by Medicare Part D and Tricare is limited to FDA approved components of the compounded medications.

36.     Bulk drug substances — usually raw powders — are generally not approved by the FDA because of questions of safety and efficacy.

37.     Because bulk powders are not FDA approved drug products, they are not reimbursable under Medicare Part D or Tricare.

38.     Active ingredients used to make a compounded drug — including bulk drug substances — are assigned national drug codes.

9

39.    Claims for payment to Insurance must state the NDCs for those drugs actually used in the compound.

40.    Tricare, Medicare Advantage organizations, and Part D Plan Sponsors generally will not pay for bulk drug substances, and if they do, it is for less than the comparable FDA approved product because the actual cost to the pharmacy is much lower.

41.    Medicaid does pay for some bulk drug substances, but also at a cost lower than the comparable manufactured product.

42.    42 C.F.R. § 423.505(k)(3) requires that the pharmacy "certify that the claims data it submits… are accurate, complete, and truthful, and acknowledge that the claims data will be used for the purpose of obtaining Federal reimbursement."

43.    Lake Country uses bulk drug substances as the ingredients in its compound drugs, but knowingly submits claims to Insurance that state that it used the comparable FDA-approved drug product.

44.    By using bulk ingredients but billing for FDA-approved ingredients, Lake Country is defrauding Insurance by submitting false claims for ingredients that would not otherwise be reimbursed, or, for some limited Medicaid claims, upcoding from bulk ingredients to more expensive ingredients.

45.    Moreover, every time a beneficiary has a prescription filled under Medicare

Part D, the plan sponsor must generate and submit a prescription drug event ("PDE") record.

46.     The PDE record contains drug cost, payment, prescribing, dispensing, and utilization data, as well as a code that indicates whether a prescription is for a compounded drug.

47.     Because the plan sponsor generates PDE records from the false claims submitted by Lake Country, Lake Country causes the plan sponsor to create and submit PDE records that are false because they, like the claims upon which they are based, include the FDA-approved drug and the cost of that drug, rather than the bulk drug substances actually used and their associated costs.

48.     The information submitted in PDEs is material to CMS determinations of how much to reimburse for prescriptions.

49.     When a prescription for a compound drug arrives at Lake Country, the pharmacist or a pharmacy technician first enters the customer's information, including their insurance provider, into the electronic records system, Pioneer.

50.     The pharmacist then selects the compound type, which then displays the various ingredients that will ultimately be billed to Insurance.

51.     Notwithstanding whatever ingredients Pioneer shows, the pharmacist separately pulls a recipe for making the compound with bulk ingredients.

11

52.     If this is a compound that Lake Country has not previously billed to that

particular Insurance, it bills for the combination of FDA-approved ingredients

that offers the highest reimbursement.

53.     If that claim is rejected, it changes the combination of ingredients billed

again and again, for less compensation each time, until a claim is accepted and

paid.

54.     Once a formula is accepted for payment, a parenthetical code is entered

into the system so that all future prescriptions filled are billed the exact same way

(AF for "all formulary" or IC for "insurance coverage").

55.     These codes are visible in the system, and upon information and belief,

they are included in the name of the compound on the claims submitted to

Insurance.

56.     For example, on February 11, 2016, Lake Country filled a prescription for

Customer ZW for a 14-day supply of Leuprolide Acetate 5 mg/ml, Rx Number

726216, which it billed to Tricare.

57.     Lake Country made the compound with bulk ingredients — Leuprolide

Acetate powder (NDC 38779-2629-06) — but billed Tricare under the AF code,

meaning that it billed for commercial pharmaceutical ingredients.

58.     Moreover, upon information and belief, Customer ZW had that

prescription refilled, which was falsely billed to Tricare in the same manner.

59.   Secondary insurance pays for costs that primary insurance does not cover, including deductibles and copayments charged by Medicare and Tricare.

60.   Customer MD is an example of a patient who had Medicare as his primary insurance and Medicaid as his secondary insurance.

61.   Lake Country filled a prescription for Customer MD for a cream it calls ABCGKKL 4/2/2/6/10/10/2% cream (each letter referring to an ingredient in the cream).

62.   When Lake Country makes this cream, it uses a formula including the following bulk ingredients: Amitriptyline HCL powder (NDC 62991-2004-04), Baclofen powder (NDC 62991-1013-05), Cyclobenzaprine HCL powder (NDC 62991-1040-06), Gabapentin powder (NDC 62991-2204-03), Ketamine HCL powder (NDC 38779-1754-06), Salt Stable LS Advanced Cream (NDC 00395-6021-57), Emulsion Concentrate (NDC 00395-6021-57), and Dimethyl Sulfoxide liquid (NDC 62991-2192-01). This formula costs approximately $0.32 per unit and $32 per batch to make.

63.   When Lake Country bills Insurance for this same cream, it bills for commercial pharmaceutical ingredients for Amitriptyline HCL 100 mg tablets (NDC 00781-1490-01), Baclofen 20 mg tablets (NDC 16714-0072-04),

13

Cyclobenzaprine 10 mg tablets (NDC 00591-5658-10), Gabapentin 100 mg

capsules (NDC 16714-0661-02), Ketamine HCL Powder (NDC 51927-2790-00),

Magnesium Chloride Crystals (NDC 62991-1242-03), Salt Durable Cream Base 4.5

kg (NDC 62991-3076-03), Emulsion Concentrate (NDC 00395-6016-98), and Ethyl

Alcohol 95% Liquid (NDC 62991-1663-02). This would cost approximately $1.2209

per unit and $122.093 per batch, and has an average wholesale price of $15.8206

per unit and $1,582.06 per batch.

64.     From January 2015 through May 2016, Lake Country submitted 15 false

claims to the PBM for ABCGKKL 4/2/2/6/10/10/2% cream, for Rx Numbers

729520, 720648, and 712501, and their respective refills.

65.     Lake Country submitted or caused to be submitted false claims to Medicare

and Medicaid for Customer MD's prescription.

66.     By falsely reporting its costs to the PBM, Lake Country caused to be

submitted PDEs with false statements to CMS.

67.     Another example, when Lake Country makes Testosterone Cream 10 mg, it

uses testosterone bulk powder, NDC 62991-2105-03, which has an actual cost of

$0.62 per batch, but bills Insurance for 200mg Testosterone Enanthate, NDC 0591-

3221-26, which has an actual cost of $25.8948 per batch. It also uses pentoxifylline

bulk powder, NDC 51927-4389-00, only $0.1133 per batch, but bills Insurance for

400mg extended release pentoxifylline, NDC 0093-5116-01, which costs $0.7854 per batch. The average wholesale price for the cream, with the commercial pharmaceutical ingredients, is $98.0784 per batch.

68.    The actual cost of the ingredients was only $32.00, the cost of the billed (but not used) ingredients was $122.093, but the average wholesale price was $1,582.06.

69.    On one occasion, Dr. Stephen Johnson of Athens Orthopedic Clinic saw how much the pharmacy charged Insurance for a patient's compound preparation, and stopped prescribing compounded topical pain creams for patients to fill at Lake Country.

70.    Upon information and belief, this was because Lake Country's scheme could max out some of his patients' benefits.

71.    The difference between an extended release drug and a regular drug is the method in which it is administered, such as a slowly dissolving capsule. The drug itself is the same.

72.    Thus a compounding pharmacy acting legitimately is unlikely to use an extended release version if a standard version is available, particularly because the extended release version often costs considerably more.

73.    Lake Country submits false claims for the extended release version of

medications to drive up the reimbursement when it uses standard versions in its compounds.

74.    For example, through May 2015, when Lake Country made a compound with cyclobenzaprine, it billed for Amrix, the extended release version.

75.    As an example, Customer MW had a compound drug prescription (referred to at Lake Country as BBCDGK) filled by Lake Country that was made with bulk cyclobenzaprine powder, NDC 62991-1040-06, but falsely billed to Medicare as having been made with Amrix.

76.    Lake Country has filled or refilled this prescription for Customer MW, and submitted claims for payment to Medicare, on a monthly basis since at least December 2014.

77.    In or about May 2015, APNS cautioned the Vaughans that the amount billed per prescription was getting high and might start "raising red flags."

78.    At that time, Carey Vaughan decided to take Amrix out of the AF and IC billing formulas to keep the numbers down and not raise suspicion.

79.    In January 2016, CVS/Caremark denied a claim by Lake Country for 18g of a compound preparation, which is the amount required to fill and prime a Topi-Click dispenser, which results in 15.5 grams of usable medication (31 days of medication at 0.5g or 2 clicks per day).

80.    In response, Lake Country converted to tracking and billing by "clicks" of a Topi-Click dispenser rather than quantity of medication.

81.    For example, instead of "Testosterone 10mg/0.5 gm Cream (AF)," it would now read "Testosterone 10mg/2 clks Cream (AF)."

82.    By concealing the actual quantity, Lake Country was able to bill for a larger quantity of ingredients.

83.    When billing Insurance for prescription medicines, pharmacies may not charge any more than their "usual and customary" (U&C) price.

84.    The U&C price is defined as the "cash price offered to the general public."

85.    Lake Country manipulates its data so that Insurance (Government and private) cannot see its U&C pricing.

86.    Insurance has access to Lake Country's information regarding cash payments, which it monitors to ensure that it is not paying more than retail customers, but it does not have access to what other insurance plans are paying.

87.    Lake Country bills its cash-paying customers at a much lower price, because it is actually billing them for the bulk ingredients that were used, and not the commercial pharmaceuticals.

88.    When entering the information into Pioneer, Lake Country hides the cash transactions by entering them under a fake insurance it calls the Lake Country

Plan.

89.     Because the transactions are entered into the system as if they were paid by a private insurance plan, Insurance cannot see the data, and so does not know it is being charged considerably more than cash customers for the same drugs.

### TrOOP Manipulation

90.     True out-of-pocket (TrOOP) costs are the expenses that count toward a person's Medicare drug plan out-of-pocket threshold.

91.     TrOOP costs determine when a person's catastrophic coverage portion of their Medicare Part D prescription drug plan will begin.

92.     By engaging in TrOOP manipulation, Lake Country pushes beneficiaries through the coverage gap so they can reach catastrophic coverage before they are eligible.

93.     Lake Country operates what it calls an "LC Flex Account" for its customers that is essentially a waiver of copayments and deductible amounts.

94.     Under this scheme, the LC Flex Account "pays for" some or all of the customer's costs, including the initial deductible and the copay.

95.     These amounts are charged to the LC Flex Account as if the customer were using some sort of pharmacy credit account, but in actuality, the pharmacy fraudulently writes it off as a loss.

18

96.    It was not uncommon for a single prescription to push a customer through their entire out-of-pocket threshold (after which, for Medicare Part D, they pay only 5% copayments).

97.    Nearly every Insurance beneficiary who would have had to pay out-of-pocket has their copayments waived via the LC Flex Account.

98.    Customers who have Medicaid as a secondary insurance are viewed as a goldmine by the Vaughans, because Medicaid will pay for the customer's deductibles or copayments from its primary Insurance, so it does not have to waive the copayments.

99.    When customers have Medicare as their primary insurance and Medicaid as their secondary insurance, the pharmacy submits the entire claim to the PBM, including information that Medicaid is a secondary insurer. The PBM, in turn, bills Medicaid for the costs not covered by Medicare.

100.    By submitting false claims to Medicare, when the customer has Medicaid as a secondary insurance, Defendants cause false claims to be submitted to Medicaid.

101.    Moreover, by falsely upcoding the ingredients, Medicaid secondary insurance pays for copayments higher than it would had a true claim been submitted, since copayments are often for a percentage of the cost of the drug.

102.   Customer MD, above, is an example of a patient for whom Lake Country submitted a false claim to Medicare, which in turn submitted a false claim to Medicaid.

### Retaliation Against Relator

103.   On Wednesday, May 4, 2016, Relator participated in an online training course on pharmacy fraud offered by HealthMart as a part of his Continuing Education requirements.

104.   During this course Relator realized that the schemes discussed above constituted fraud against the government, and that very evening, he wrote a letter to the Vaughans alerting them to this belief, which he texted to them the following morning, Thursday, May 5.

105.   On Saturday, May 7, in the first discussion since he sent the text, he was placed on administrative leave and asked to resign because of this letter.

106.   An email sent to Relator by Carey Vaughan on May 8 confirmed that he was being asked to resign because of his allegations.

107.   Relator refused to resign, and on or about June 3, 2016, in an email from Carey and Chris Vaughan, Lake Country terminated Relator's employment.

### COUNT I

### Violation of 31 U.S.C. § 3729 – Federal False Claims Act

108.   Relator incorporates and realleges herein all other paragraphs as if fully set forth herein.

109.   As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly presented or caused to be presented numerous false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

110.   As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

111.   As set forth above, Defendants, conspired to commit a violation of the False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(C).

112.   Due to Defendants' conduct, the United States Government has suffered substantial monetary damages.

113.   The United States is entitled to treble damages based upon the amount of damage sustained by the United States as a result of the aforementioned violations of the Federal False Claims Act, 31 U.S.C §§ 3729-3733, in an amount that will be proven at trial.

114.    The United States is entitled to a civil penalty as required by 31 U.S.C. § 3729(a) for each of the fraudulent claims and statements.

115.    Relator is also entitled to reasonable attorney's fees and costs, pursuant to 31 U.S.C. § 3730(d)(1).

## COUNT II

**Violation of Ga. Code Ann. § 49-4-168.1 – State False Medicaid Claims Act**

116.    Relator incorporates and realleges herein all other paragraphs as if fully set forth herein.

117.    As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the Georgia Medicaid program numerous false or fraudulent claims for payment or approval, in violation of O.C.G.A. § 49-4-168.1(a)(1).

118.    As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of O.C.G.A. § 49-4-168.1(a)(2).

119.    As set forth above, Defendants conspired to defraud the Georgia Medicaid program by getting false or fraudulent claims allowed or paid, in violation of O.C.G.A. § 49-4-168.1(a)(3).

120.    Due to Defendants' conduct, the State of Georgia has suffered substantial monetary damages.

121.    The State of Georgia is entitled to treble damages based upon the amount of damage sustained by the State of Georgia as a result of the aforementioned violations of the State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1, in an amount that will be proven at trial.

122.    The State of Georgia is entitled to a civil penalty as required by Ga. Code Ann. § 49-4-168.1 for each of the fraudulent claims.

123.    Relator is also entitled to reasonable expenses which the court finds to have been necessarily incurred and reasonable attorney's fees and costs, pursuant to Ga. Code Ann. § 49-4-168.2(i).

## COUNT III

### Violation of 31 U.S.C. § 3730 – Retaliation

124.    Relator incorporates and realleges herein all other paragraphs as if fully set forth herein.

125.    Defendants violated Relator Coleman's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against him for lawful acts done by him in furtherance of an action under the False Claims Act and other efforts to stop one or more violations alleged in this action.

23

126.   As a result of Defendants' actions, Relator Coleman has suffered damages in an amount to be shown at trial.

## COUNT IV

### Violation of Ga. Code Ann. § 49-4-168.4 – Retaliation

127.   Relator incorporates and realleges herein all other paragraphs as if fully set forth herein.

128.   Defendants violated Relator Coleman's rights pursuant to Ga. Code Ann. § 49-4-168.4 by retaliating against Relator Coleman for lawful acts done by Relator Coleman in furtherance of an action under this section, including investigating matters that could reasonably lead to the filing of such an action.

129.   As a result of Defendants' actions, Relator Coleman has suffered damages in an amount to be shown at trial.

## COUNT V

### Breach of Contract

130.   Relator incorporates and realleges herein all other paragraphs as if fully set forth herein.

131.   In March 2015, Relator was given a written employment offer by Lake Country that included store net profit sharing.

24

132.   Relator accepted the terms of the offer, and worked for Lake Country under these terms from March 2015 through May 2016.

133.   Lake Country has never paid Relator under any profit sharing plan.

134.   As a result of Defendants' actions, Relator Coleman has suffered damages in an amount to be shown at trial.

## COUNT VI

### Violation of O.C.G.A. § 13-6-11

135.   Relator incorporates and realleges herein all other paragraphs as if fully set forth herein.

136.   By the actions and as more particularly described above, Defendants have acted in bad faith, have been stubbornly litigious and have put Relator Coleman to unnecessary trouble and expense.

137.   Accordingly, Relator Coleman is entitled to recover his attorneys' fees and expenses incurred in protecting his rights in this action.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment:

(a) awarding the United States treble damages sustained by it for each of the false claims;

(b) awarding the United States the maximum civil penalty for each of the false claims and statements;

(c) awarding the State of Georgia treble damages sustained by it for each of the false claims;

(d) awarding the State of Georgia the maximum civil penalty for each of the false claims;

(e) awarding Relator 30% of the proceeds of this action and any alternate remedy or the settlement of any such claim;

(f) awarding Relator special damages resulting from the retaliation pursuant to 31 U.S.C. § 3730(h) and O.C.G.A. § 49-4-168.4;

(g) awarding Relator litigation costs and reasonable attorney's fees;

(h) awarding Relator damages incurred as a result of Defendants' breach of contract; and

(i) granting such other relief as the Court may deem just and proper.


Respectfully submitted,


Julie K. Bracker
Georgia Bar No. 073803

Jason Marcus
Georgia Bar No. 949698
**BRACKER & MARCUS LLC**
3225 Shallowford Road
Suite 1120
Marietta, GA 30062
Tel. (770) 988-5035
Fax (678) 648-5544
Julie@FCAcounsel.com
Jason@FCAcounsel.com

John F. Beasley, Jr.
Georgia Bar No. 045010
**JF Beasley, LLC**
31 N. Main Street
P.O. Box 309
Watkinsville, GA 30677
Tel. 706-769-4410
Fax. 706-769-4471
jfbeasley@jfbeasleylaw.com